**4NITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

**WALLACE INTERNATIONAL TRUCKS, INC.,**

Plaintiff,

**v.** **CASE No. 2:05-cv-277–FTM-34DNF**

**MAGRUDA TRUCKING COMPANY, LP,**

Defendant.
_______________________________________/

**O R D E R**

On November 13, 2006 and November 14, 2006, the Court heard evidence in this case and makes the following findings of fact and conclusions of law. The two primary witnesses to this rather bizarre scenario, which is certainly not a model of good business practices, are Mr. James Boncosky ("Mr. Boncosky"), a representative of the Plaintiff and Mr. Vernon Magruda ("Mr. Magruda"), a partner of the Defendant. The Court must make credibility findings between the two and finds Mr. Magruda severely lacking in believability and credibility. To the extent that there is conflicting testimony, the Court accepts that of Mr. Boncosky over that of Mr. Magruda.

The Plaintiff filed its Closing Argument and Amended Request for Findings of Fact and Conclusions of Law (Dkt. 54) on November 24, 2006. Defendant submitted a Supplemental Trial Brief in lieu of a closing argument (Dkt. 55).

## I. Background

Plaintiff, Wallace International Trucks, Inc. ("Wallace"), is a Delaware corporation licensed to conduct business in the State of Florida with its principal place of business located at 2761 East Edison Avenue, Fort Myers, Florida. Wallace is a licensed dealer and distributor for International Truck and Engine Corporation ("International"). In that capacity, Wallace sells and repairs new and used

International trucks and engines. Defendant, Magruda Trucking Company, LP ("Magruda"), is a Pennsylvania limited liability partnership with its principal place of business located at 7931 Lincoln Highway, Central City, Pennsylvania. Magruda operates a second place of business in the State of Florida at 14611 Sherbrook Place, Fort Myers, Florida. Magruda is engaged in the transportation and trucking business.

Beginning in December 2002 through April 2004, Magruda was a frequent customer of Wallace, purchasing numerous dump trucks, tractors and trailers from Wallace. From December 2002 to approximately October 2004, Magruda had an "open account" with Wallace that allowed Magruda to obtain on credit certain parts, service and repairs on its trucks and trailers.

In this action Wallace asserts claims against Magruda sounding in contract, tort, open account and account stated. Wallace's claims are identified in the Complaint as follows: Conversion (Count I) and Breach of Contract (Count II) on a Model 7600 International tractor truck (the "Model 7600"); Conversion (Count III), Fraudulent Misrepresentation (Count IV) and Breach of Contract (Count V) on a Ford truck (the "Ford"); Conversion (Count VI) and Breach of Contract (Count VII) on a 1992 Fontaine Trailer (the "Trailer"); failure to pay an Open Account (Count VIII); and, the balance owed on an Account Stated (Count IX). In addition, Wallace asks that the Court grant him compensatory and consequential damages and costs, interest and attorneys' fees and any other relief that the Court deems just and proper.

The claims advanced by Wallace arise from dealings between the parties over the two year period from December 2002 through April 2004. With Magruda's assent, Wallace agreed to dismiss the claims set forth in Counts III and VI. Pursuant to Fed. R. Civ. P. 52(a), each of the remaining claims contained in the Complaint and presented at trial are addressed further by the Court's findings of fact and conclusions of law below.

In response to the Complaint, Magruda filed its Answer, which contained a four count

Counterclaim. Magruda later filed an Amended Counterclaim containing two counts - Declaratory Judgment (Count I) on the Trailer and Open Account (Count II). Before trial, the parties filed a joint stipulation of dismissal of Count II.

## II. Findings of Fact

The Court hereby makes the following findings of material fact upon the evidence presented by the parties at trial in this cause:

### A. The Model 7600

On or about March 24, 2003, Magruda purchased an International Model 7500 dump truck, VIN No. 1HTWPAAT42J030140 (the "Model 7500") from Wallace's inventory for $100,250.00. (Exhibit 6). Magruda financed $89,575.00 of the purchase price of the Model 7500 through International Finance Group ("IFG") under a conditional sales contract. International issued an express warranty on the Model 7500 (Exhibit 7) under which any claim for warranty repair of the Model 7500 or lost revenues caused by the reliability and performance issues was the responsibility of International.

On or about January 21, 2004, Magruda informed Wallace that the Model 7500 was defective and that due to the reliability and performance issues, Magruda did not want to continue operating the Model 7500. On January 22, 2004, Magruda delivered the inoperable Model 7500 to Wallace's dealership in Fort Myers, Florida. At the time of delivery back to Wallace, Magruda owed IFG over $80,000.00 on the Model 7500.

Magruda requested Wallace's assistance in reaching a financial resolution with International and IFG over the Model 7500. Wallace agreed to act as an intermediary between Magruda and International in an attempt to broker a resolution of the dispute that had arisen over the disposition of the Model 7500. Magruda informed Wallace that it wanted International and IFG to release it from its financing obligations and to provide it with a new tractor truck and trailers as a replacement. Beginning in January 2004,

Wallace contacted International on Magruda's behalf and proposed a collateral swap whereby International would exchange a Model 7600 tractor truck and two flat-bed trailers, which International would purchase from Wallace, for the Model 7500.

At the time Wallace suggested the swap, International owned a new Model 7600 tractor trailer, VIN No. 1HSWYAXR13J049839, which was parked at Wallace's dealership in Fort Myers. International informed Wallace that it would consider the proposed collateral swap and would look into the relative values of the collateral that would be exchanged. At the time the collateral exchange was proposed, the Model 7600 had a retail value of $86,239.86, which included sales taxes in the amount of $4,392.86 and excise taxes in the amount of $8,785.72. (Exhibit 9). The two flat-bed trailers included in the proposed swap were owned by Wallace and purchased for $27,250.00.

In late January, Wallace contacted Mr. Bob Mann of International and obtained his permission to allow Magruda to demonstrate or utilize the Model 7600 while International and Magruda continued negotiating about the disposition of the Model 7500. Wallace informed Magruda that the Model 7600 and flat-bed trailers would be available for Magruda's use while Magruda continued to negotiate with International over the disposition of the Model 7600. Wallace further informed Magruda that Magruda would have to either return or purchase the Model 7600 from International and the flat-bed trailers from Wallace if International and Magruda did not agree to an exchange of the Model 7500 for the Model 7600.

In the last week in January, Magruda took possession of the Model 7600 and the two flat-bed trailers and began operating the Model 7600 in the ordinary course of business with temporary tags provided by Wallace. Magruda informed Wallace that it would only accept the proposed collateral exchange if it received consideration in the full amount of the Model 7500 purchase price of $102,250.00, and not simply consideration valued in the amount Magruda still owed IFG on the Model 7500, which was at the time over $82,000.00. On May 7, 2004, International sent Wallace an invoice for the Model 7600

requesting payment on the truck in the amount of $62,8000.42. After invoicing the Model 7600 to Wallace, Wallace became the owner of the Model 7600 and carried the Model 7600 on its floor plan.

In early June of 2004, Magruda was cited for operating the Model 7600 with temporary license plates. After receiving the citation for operating the Model 7600 with temporary license plates, Magruda informed Wallace that it wanted to obtain an International Registration Plan ("IRP") Apportioned license plate for the Model 7600 so that Magruda could operate the Model 7600 legally in interstate commerce. In order to allow Magruda to obtain the IRP Apportioned license plate that it needed, Wallace agreed to place Magruda's name on the title for the Model 7600. Wallace agreed to place Magruda on the title of the Model 7600 with the understanding that: 1) Magruda would have to pay Wallace for the Model 7600 if International did not pay for it as part of the resolution of the Model 7500 dispute and 2) the lien would be placed on the title to protect Wallace's ownership interest in the Model 7600.

Previously Wallace had accommodated Magruda by allowing it to take possession of trucks prior to finalization of the transaction, and in such cases Wallace routinely placed title to the vehicle in Magruda's name and placed a lien on the title to protect its interest in the vehicle. Magruda affirmatively acknowledged to Wallace that it understood that Wallace needed to protect its interest in the truck and that it had no objection to Wallace placing a lien on the title of the Model 7600. On June 14, 2004, Mr. Magruda signed the application for title of the Model 7600. The application indicated that the Model 7600 would have a lien on it in the name of Navistar Financial Corporation ("Navistar"). (Exhibit. 83).

On June 16, 2004, in order to help Magruda with its efforts to secure an IRP Apportioned license plate, Wallace submitted the application for a certificate of title (Exhibit 83) that Mr. Magruda had executed to the Florida Department of Highway Safety and Motor Vehicles. This application clearly indicates that a lien will be placed on the title in favor of Navistar. Upon discovery that the lien on the

certificate of origin did not match the lien on the application for title, the Florida Department of Highway Safety and Motor Vehicles allowed the lien to be transferred to Wallace.  Mr. Phillip Hackett, Wallace's Finance Manager, executed an affidavit attesting to the grounds for this transfer while in the presence of the title clerk at the Florida Department of Highway Safety and Motor Vehicles.  On June 16, 2004, title for the Model 7600 was issued  in Magruda's name with a lien in favor of Wallace.  At all relevant times, Wallace has maintained and continues to maintain physical possession of the title to the Model 7600.

Also on June 16, 2004, while at Wallace's offices, Mr. Magruda prepared an application for temporary operating permit ("TOP") under the IRP Apportioned license plate program that Wallace later delivered to the Florida Department of Highway Safety and Motor Vehicles along with the application for title for the Model 7600.  On June 16, 2004, the Lee County Tax Collector's Office on behalf of the Florida Department of Highway Safety and Motor Vehicles issued a TOP for the Model 7600 in Magruda's name. Under Florida law, specifically Fla. Stat. § 320.0715, which the Court took judicial notice of, an "[a]pplication for permanent registration must be made to the department within ten days from issuance of a [TOP].  Failure to file an application within this 10 day period may result in cancellation of the [TOP]."  Magruda failed to submit a completed IRP Application to the Florida Department of Highway Safety and Motor Vehicles within the time allotted under the statute and thus, never received the IRP Apportioned license plate that would have allowed him to legally operate the Model 7600 on the public roadways of the United States.

In the spring of 2004, after Wallace was unable to make any progress with International on the proposed collateral exchange, Magruda began negotiating directly with International in an effort to resolve its dispute over the Model 7500.  On November 4, 2004, Magruda entered into a confidential written settlement agreement with International that resolved all issues arising from Magruda's purchase of the Model 7500.  Specifically, International agreed to pay off Magruda's debt of $86, 296.77 owed to IFG, pay

Magruda $34,500.00 in cash and provide eight extended warranties for eight trucks owned by Magruda. (Exhibits 47 & 48). While the settlement agreement resolved all issues related to the Model 7500, it did not include the Model 7600 as consideration for the agreement. (Exhibits 47 & 48). The settlement agreement expressly provided that Magruda had released all International dealers, including Wallace, from any claims arising from Magruda's acquisition of the Model 7500. (Exhibits 47 & 48). Because the settlement agreement's contents were confidential, Wallace was informed that Magruda and International had reached agreement but Wallace was not made privy to the terms of the settlement agreement.

In December of 2004, Mr. Magruda informed Mr. Boncosky that Wallace was "free" to pick up the Model 7600. When Mr. Boncosky telephoned Mr. Magruda to make arrangement to pick up the 7600, Mr. Magruda informed him that he had changed his mind and would not return the Model 7600 to Wallace. Subsequent to this conversation, Wallace called Magruda and demanded that it either immediately remit payment for the Model 7600 or return it to Wallace. Magruda refused to do either. In December of 2004, International agreed to provide Wallace with $27,000.00 that Wallace used to cover the cost of the trailers it had provided to Magruda. Also in December 2004, International agreed to provide Wallace with an additional $9,000.00 to cover the diminution in value of the Model 7600 caused by Magruda's use of it.

On January 5, 2005, Wallace was required to pay the amount of $62,800.42 to International as full and final payment for the Model 7600. At no time has Magruda ever paid any monies to International or Wallace for the Model 7600. Magruda never provided Wallace or International with any consideration for its use or possession of the Model 7600. Although the Model 7600 remains in Magruda's sole custody and control in Central City, Pennsylvania, Wallace is the equitable owner of the Model 7600. At the time of Magruda's settlement with International, the Model 7600 was valued at $60,000.00.

Before September 21, 2005, Magruda used the Model 7600 to haul a generator from Chicago to Louisiana in the aftermath of Hurricane Katrina and continued to use the Model 7600 in Louisiana as part

of hurricane relief efforts until sometime in November 2005. (Exhibit 84). Magruda earned $600.00 per day for the use of the Model 7600 as part of the hurricane relief efforts.

**B. The Ford**

In April 2004, Wallace and Magruda entered into an agreement, negotiated by Mr. Tom Zelter ("Mr. Zelter") and Mr. Ken Wallace of Wallace with Mr. Magruda, by which Magruda would convey six used dump trucks to Wallace, including a Ford, Vin No. 1FD2A90W9VVA22260 and a Volvo truck ("Volvo"). In return for the used dump trucks, Wallace conveyed three sleeper tractors, two trailers and cash to Magruda. Pursuant to the terms of the agreement, Magruda was to deliver all of the dump trucks to Wallace in Fort Myers, Florida. In March of 2004, Mr. Zelter traveled to Magruda's place of business in Central City, Pennsylvania and inspected four of the six dump trucks that were part of the exchange. Following the inspection, an employee of Magruda's used a dump truck inspected by Mr. Zelter to drive Mr. Zelter from Pennsylvania to Florida.

Prior to April 6, 2004, Magruda expressly represented to Wallace that title to the Ford was unencumbered, that it was in Magruda's sole and exclusive possession and that it would be delivered upon payment of the agreed purchase price of $25,000.00. On April 6, 2004, Mr. Magruda visited Wallace's dealership and demanded that he be fully paid for the six dump truck deal. During that visit, Wallace paid Magruda for the equity value of the Volvo, $21, 651.20, and the total agreed upon acquisition price for the Ford, $25,000.00 via a check in the amount of $46, 651.20. (Exhibit 22). Also on April 6, 2004, Wallace gave Magruda a check for $20,332.19, which was the balance of all remaining sums due to Magruda under the terms of the six dump truck deal. (Exhibit 22). By April 6, 2004, Magruda had already taken possession of two of the three new sleeper tractors that Wallace had agreed to sell Magruda and Wallace had identified the third sleeper tractor but had not yet delivered it. Before concluding his business with Wallace on April 6, 2004, Mr. Magruda assured Wallace that the title to the Ford was located at his office

in Pennsylvania and would promptly be forwarded to Wallace upon Mr. Magruda's return to his office within the next two days.

On April 15, 2004, Mr. Magruda contacted Harleysville Bank and Trust Company, 483 Main Street, Harleysville, Pennsylvania (the "Bank") and requested a payoff figure for the Ford.  During that conversation, Magruda informed the Bank's representative that he had "put too much money into repairs on this unit and wants to cut his losses and sell the equipment." (Exhibit 59).  In late April of 2004, Wallace hired R&R Truck Sales Inc. ("R&R"), a Mack truck dealer located in Akron Ohio, to pick up the three used dump trucks from Magruda at Magruda's office in Central City, Pennsylvania.  On April 28, 2004, R&R retrieved the three dump trucks from Magruda's property and drove the trucks to R&R's dealership in Akron Ohio.

In anticipation and in full reliance on Magruda's promise to deliver an unencumbered title for the Ford, Wallace negotiated an agreement to sell the Ford to R&R for $20,000.00.  Unbeknownst to Wallace, R&R negotiated the sale of the Ford to Ray's Auto Sales ("Ray's"), a truck dealer in Grundy, Virginia for $29,000.00  On or about June 20, 2004, the Ford was shipped to Ray's, where it had approximately $4,000.00 in repair work done.  From April of 2004, when Wallace constructively took possession of the Ford,  through September 2004, Wallace repeatedly requested that Magruda clear title to the Ford and have clean title delivered to Wallace.  During the April through September 2004 time period Magruda continually represented to Wallace that the title was free of liens and would be delivered shortly.

In October of 2004, Magruda informed Wallace that it would not send the title to the Ford to Wallace until Wallace paid a debt that Magruda claimed Wallace owed it.  In November 2004, Magruda contacted R&R and offered to sell it the Ford for $25,000.00. (Exhibit 32).  In November or December of 2004, Wallace learned that Magruda did not have title to the Ford and that the Ford was actually owned by the Bank pursuant to a lease agreement between the Bank and Magruda (the "Lease Agreement").  After

learning that the Bank possessed the title to the Ford, Wallace notified R&R, who in turn notified Ray's that title to the Ford would not be forthcoming. Wallace returned R&R's $20,000.00 check for the purchase payment of the Ford, paid Ray's $4,000.00 for the repairs it performed and paid Bennie Burks $875.00 for transportation costs associated with the shipment of the Ford from Virginia to Fort Myers, Florida.

At all times relevant and material to Magruda's sale of the Ford to Wallace, Magruda knew that the Bank possessed title to the Ford and that the Lease Agreement prohibited the sale of the truck without the Bank's written consent. (Exhibit 51). On April 27, 2005, Magruda informed the Bank that it had sold the Ford along with two other trucks to Wallace. (Exhibit 52). The Bank never gave Magruda permission to sell the Ford. On April 28, 2005, the Bank demanded that Wallace surrender possession of the Ford to it. On or about August 5, 2005, the Bank filed suit against Magruda in state court in Pennsylvania citing breach of the Lease Agreement. On September 21, 2005, the Bank obtained a Judgment by Confession against Magruda. In October 2005, Wallace informed the Bank that it would agree to surrender possession of the Ford and in return the Bank agreed not to file suit for recovery of the Ford. In November 2005, Magruda entered into a settlement agreement with the Bank by which it paid the Bank $28,000.00 and in return received possession of and title to the Ford. (Exhibit 55). From November 2004 through January 2006, Wallace stored the Ford at a vendor's lot in Fort Myers, Florida. In January 2006, an agent for the Bank picked up the Ford from Wallace. After recovering possession and title to the Ford in January 2006, Magruda sold the Ford a second time. Magruda never provided title to the Ford to Wallace or refunded the $25,000.00 that Wallace paid Magruda for the purchase of the Ford.

**C. The Trailer**

In January 2004, Magruda entered into an agreement with Wallace to purchase the Trailer, VIN No. 13N245203N1555514 from Wallace for $7,500.00. In January 2004, Magruda took delivery of the Trailer

at Wallace's dealership in Fort Myers. Florida. At the time Magruda took delivery of the Trailer, it was understood that Magruda would be seeking financing on the Trailer, but that Magruda wanted to wait on the final outcome of negotiations with International regarding the disposition of the Model 7500 so that it could finance both the Trailer and the Model 7600 at the same time. In April 2004, with Magruda's consent, Wallace placed Magruda's name on the Trailer's title, with a lien in favor of Wallace. Mr. Magruda signed the application for title for the Trailer on April 15, 2004, which indicted that the Trailer had a lien on it in favor of Wallace. (Exhibit 81). The parties agreed that upon receipt of payment from Magruda, Wallace would release its lien and provide Magruda with clean title. The title for the Trailer has at all times been in Wallace's possession and accurately reflects the lien. Despite repeated requests for payment, Magruda has refused to tender any portion of the Trailer's purchase price to Wallace. Magruda has possession of the Trailer.

**D. The Accounts**

On December 16, 2002, Magruda opened an account with Wallace for the provision of parts and service billing. Wallace provided labor, service, parts and rentals to Magruda from December of 2002 to July of 2004, and applied the charges to Magruda's open account. Magruda agreed to pay for the labor, services and parts that were provided for its benefit and credited to its open account. Until approximately August 2004, Wallace mailed Magruda itemized monthly statements reflecting the charges and monthly balance on Magruda's open account. The statements reflected in Exhibit 62, which fairly and accurately depict the charges that were applied to Magruda's open account, were mailed by Wallace and received by Magruda.

Within a day of providing labor, service or parts, Wallace mailed Magruda invoices reflecting each of the charges that Wallace had applied to Magruda's account. The invoices reflected in Exhibit 63 fairly and accurately depict the charges that were applied to Magruda's open account. Before February 2004,

Magruda made regular payments on its open account.  On or about April 30, 2004, Wallace provided Magruda with a  monthly statement reflecting an accrued outstanding balance of $35,001.01.

In September 2004, Mr. Magruda met with Mr. Boncosky several times to review Magruda's open account statement and the attendant invoices.  As a  result of these meetings, Wallace agreed to grant over $14,000.00 in credits and concessions to Magruda and in exchange Magruda acknowledged a revised open account debt in the amount of $20,563.28.  Mr. Magruda was provided with a copy of the new balance of $20,563.28 for his open account.

Following discussions in October 2004 regarding a global resolution of all issues between Magruda and Wallace, Magruda notified Wallace that it had no intention of paying Wallace for his open account. Magruda has made no payment to Wallace on the open account for the agreed balance of $20,563.28.

## III.   Conclusions of Law

The Court hereby makes the following conclusions of law based upon the findings of fact listed above and the evidence presented by the parties at trial in this cause:

### A.   The Model 7600

#### Count I

The evidence is sufficient to support a ruling in favor of Wallace on Count I of its Complaint asserting a claim for conversion of the Model 7600.  To prove a claim for conversion under Florida law, a plaintiff must demonstrate by preponderance of the evidence: 1) specific and identifiable property; 2) an immediate right to possess the property; 3) an unauthorized act which deprives the plaintiff of the property; and, 4) a demand for return of the property and a refusal to do so.  U.S. v. Bailey, 288 F. Supp. 2d 1261 (M.D. Fla. 2003).

In this case, the Model 7600 is the property at issue.  Wallace had an immediate right to possess the property after Magruda and International had settled all claims existing between them without including

the Model 7600, for which International had already received compensation from Wallace. By refusing to return or pay for the Model 7600 after it settled its claims with International on November 6, 2004, and after Wallace made a demand for the truck, Magruda wrongfully deprived Wallace of the use and possession of the Model 7600. Id.; see also Carl v. Republic Security Bank, 282 F. Supp. 2d 1358 (S.D. Fla. 2003).

For Magruda's conversion of the Model 7600, Wallace is entitled to an award of damages commensurate with the fair market value of the Model 7600 at the time the truck was converted by Magruda. The proper measure of damages in a conversion action is the fair market value of the property converted on the day it was converted plus legal interest to the date of judgment. See Florida Farm Bureau Cas. Ins. Co. v. Patterson, 611 So. 2d 558, 559 (Fla. 1st Dist. Ct. App. 1992); Cutler v. Pelletier, 507 So. 2d 676 (Fla. 4th Dist. Ct. App. 1987); Mercury Motor Exp., Inc. v. Crockett, 422 So. 2d 358 (Fla. 1st Dist. Ct. App. 1982); and Page v. Matthews, 386 So. 2d 815 (Fla. 5th Dist. Ct. App. 1980). In this case, the Model 7600 was worth approximately $60,000.00 on the date of conversion. Wallace is further entitled to legal interest up to and including the day that judgment is entered against Magruda by the Clerk of the Court.

Punitive damages are appropriate on a conversion claim where the circumstances surrounding the conversion are such to show fraud, actual malice, deliberate violence, or oppression or gross negligence as to indicate a wanton disregard for the rights of others. U.S. v. Bailey, 288 F. Supp. 2d 1261, 1265 (M.D. Fla. 2003) (citing to Sporting Goods Distribs. v. Whitney, 498 F. Supp 1088, 1092 (N.D. Fla. 1980)). When Magruda refused to pay for or return the Model 7600 after it settled its claims with International and after Wallace made a demand for the truck, Magruda demonstrated wanton disregard for Wallace's possessory rights in the truck. Id.

Wallace asks the Court for punitive damages in an amount three times the value of the Model 7600

on the date the truck was converted, or, in the alternative Wallace asks the Court to award it punitive damages equal to the $600.00 per day in income that Magruda derived from the Model 7600 during its service in the aftermath of Hurricane Katrina from September 2005 through November 2005. The Court finds that Magruda acted with wanton disregard for the rights of Wallace and thus, Wallace is entitled to punitive damages in the amount of $120,000.00.

**Count II**

To prove a claim for breach of contract under Florida law, the plaintiff must demonstrate by preponderance of the evidence that: 1) it had a valid contract; 2) there was a material breach by the defendant; and, 3) the plaintiff was damaged by defendant's breach. J.J. Gumberg v. Janis Servs., Inc., 847 So. 2d 1048, 1049 (Fla. 4th Dist. Ct. App. 2003). In this case, there is no written contract; however, a "contract implied in fact is one form of an enforceable contract; it is based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words." Commerce P'ship 8098 Ltd. P'ship v. Equity Contr. Co., 695 So. 2d. 383, 385 (Fla. 4th Dist. Ct. App. 1997) (citing to 17 Am. Jur. 2d "Contracts" § 3 (1964); 1 Arthur Lintin Corbin, Corbin on Contracts §§ 1.18-1.20 (Joseph M. Perillo ed., 1993)); See also Gem Broadcasting, Inc. v. Minker, 763 So. 2d 1149, 1150 (Fla. 4th Dist. Ct. App. 2000).

In an implied in fact contract the "assent of the parties is derived from other circumstances, including their course of dealing or usage of trade or course of performance." Restatement (Second) of Contracts § 4, cmt.A (1982); Rabon v. Inn of Lake City, 693 So. 2d 1126, 1131 (Fla.1st Dist. Ct. App. 1997). In inferring an implied in fact contract, a court should give the implied contract "the effect which the parties, as fair and reasonable men, presumably would have agreed upon if, having in mind the possibility of the situation which has arisen, they had contracted expressly in reference thereto." Id. (citing Bromer v. Florida Power & Light Co., 45 So. 2d 658, 660 (Fla. 1949).

The underlying purpose in breach of contract damages is to place the non-breaching party in the same position it would have been but for the breach.  Pinnacle Aircraft Parts, Inc. v. Luxury Air, LLC, 2003 U.S. Dist. LEXIS 19753 (S.D. Fla. 2003).  Damages recoverable in a breach of contract action are those that would naturally result from the breach, either as the ordinary consequence of such breach or as a consequence that may, under the circumstances, be presumed to have been contemplated by the parties as the probable result of the breach.  First National Ins. Agency, Inc. v. Leesburg Transfer & Storage, Inc., 139 So. 2d 476, 482 (Fla. 2d Dist. Ct. App. 1962).

Where there is a total breach of contract, the plaintiff is entitled to an election of remedies.  It may treat the contract as void and seek the damages that will restore it to the position it was in immediately prior to entering into the contract or it may elect to affirm the contract, insist upon the benefit of the bargain, and seek damages that would place it in the position it would have been in had the contract been performed.  Pipeline Transport Company v. Chase Manhattan Serv. Corporation, 928 F. Supp. 1568, 1584 (M.D. Fla. 1995); McCray v. Murray, 423 So. 2d 559 (Fla. 1st Dist. Ct. App. 1982).

Evidence produced at trial supports Wallace's claim that there was an implied in fact contract between the parties regarding the Model 7600.  Specifically, it is clear that Wallace provided Magruda with the Model 7600 as an accommodation while Magruda negotiated a settlement with International for the Model 7500.  It is clear from the record, that upon closing negotiations with International, Magruda was to either return the truck to or pay Wallace for the Model 7600.  Magruda had the opportunity to negotiate with International for the Model 7600 as part of its settlement discussions, Magruda chose not to avail itself of the opportunity and instead chose a different package of compensation from International as settlement for the Model 7500.

By refusing to return or pay for the Model 7600 after it settled its claims with International on November 6, 2004, and after Wallace made a demand for the truck, Magruda breached the oral contract

it entered into with Wallace. As a direct cause of Magruda's breach Wallace sustained damages in the amount of approximately $73,000.00, which was the purchase price of the Model 7600, exclusive of taxes that would have been paid, on the date Magruda took possession of the Model 7600.[1]

**B. The Ford**

**Count IV**

To prove a claim for fraudulent misrepresentation under Florida law, a plaintiff must demonstrate by preponderance of the evidence that: 1) defendant made a false statement concerning a material fact, 2) defendant knew the statement was false when it was made or that it made the statement knowing it was without knowledge of its truth or falsity; 3) in making the statement defendant intended that plaintiff would rely on the false statement; 4) that plaintiff did rely on the false statement, and, 5) that plaintiff suffered a loss or damage as a result of its reliance. Palumbo v. Moore, 777 So. 2d 1177, 1179 (Fla. 5th Dist. Ct. App. 2001); Stired v. Carninval Corp., 243 F. Supp. 2d 1313, 1320 (M.D. Fla. 2002).

In this case it is clear that Magruda knew that it did not have clear title to the Ford when it entered into the multi-truck deal with Wallace. Wallace relied on Magruda providing it with clear title in order to complete the sale Wallace negotiated with R&R. Thus, Wallace clearly relied to its detriment on Magruda's false statement that title to the Ford was clear.

Under Florida law, a plaintiff is entitled to recovery of his actual out of pocket losses attributable to the defendant's fraudulent conduct. Laney v. American Equity Inv. Life Ins. Co., 243 F. Supp. 2d 1347, 1354 (M.D. Fla. 2003); Totale, Inc. v. Smith, 877 So. 2d 813 (Fla. 4th Dist. Ct. App. 2004). Under Florida law plaintiff is also entitled to punitive damages in situations in which there is tortuous conduct accomplished through fraud. First Interstate Dev. Corp. v. Ablanedo, 511 So. 2d 536, 539 (Fla. 1987). By

---

[1] Taxes for the Model 7600 included sales taxes in the amount of $4,392.86 and excise taxes in the amount of $8,785.72.

representing to Wallace that it had title to the Ford, Magruda caused Wallace to pay Magruda $25,000.00 when it knew that it did not have the title, thus causing Wallace to sustain recoverable damages in the amount of its out of pocket losses totaling $29,875.00 ($25,000.00 for the Ford; $4,000.00 in repairs to the Ford; and, $875 in transportation costs associated with moving the Ford). Wallace is entitled to an award of punitive damages in an amount of up to three times the value of the award of compensatory damages for fraud. Thus, the Court finds that Wallace is entitled to punitive damages in the amount of $59,750.00.

**Count V**

The elements needed to prove a breach of contract claim are discussed in detail under Count II. In this case, Wallace claims that by refusing to provide Wallace with title to the Ford, Magruda breached the oral contract it had entered into with Wallace. Wallace claims that as a direct cause of the breach it sustained damages in the amount of $29,875.00.

The Court finds that Wallace has provided sufficient evidence to prevail on its breach of contract claim for the Ford. The Ford was part of a multi-truck deal negotiated between Wallace and Magruda. The actions of the parties make clear that there was a valid agreement between the parties. Wallace fulfilled its part of the multi-truck deal, however Magruda did not. As a result Wallace's failure to provide Wallace with the Ford as promised, Wallace sustained damages of $29,875.00.

**C. The Trailer**

**Count VII**

In Count VII, Wallace again claims breach of contract, however, this time it concerns the Trailer. Wallace claims that by refusing to pay for the Trailer, Magruda breached the oral contract it had entered into with Wallace. The evidence provided by Wallace during the trial, as well as Magruda's admission that it had entered into an oral contract with Wallace for the Trailer, is sufficient to sustain a finding for Wallace on Count VII. Thus, the Court finds that Magruda owes Wallace $7,500.00 for the Trailer.

Accordingly, Count I of Magruda's Amended Counterclaim is **DENIED**. There is no evidence that in return for the Trailer Magruda gave Wallace a credit of $5,000.00 towards amounts Magruda claims that Wallace owed it.

**D. The Accounts**

**Count VIII**

To prove a claim for open account under Florida law, a plaintiff must demonstrate by a preponderance of the evidence that Magruda owes a certain sum of money to defendant for an unsettled debt arising from services and goods that were provided with the expectation of further transactions subject to further settlement. South Motor Co. of Dade County v. Accountable Const. Co., 707 So. 2d 909, 912 (Fla. 3d Dist. Ct. App. 1998); Central Ins. Underwriters, Inc. v. National Ins. Finance Co., 599 So. 2d 1371, 1373 (Fla. 3d Dist. Ct. App. 1992). Wallace has demonstrated by a preponderance of the evidence that the amount owed by Magruda to Wallace on the open account is $20,563.28, together with interest computed at 1.5% per annum.

**Count IX**

To prove a claim for account stated under Florida law, a plaintiff must demonstrate by preponderance of the evidence that: 1) there was an agreement between the parties that a certain open account balance is due, and 2) there was an express or implicit agreement to pay that balance. In re: Gulf Northern Transport, Inc. v. JR Produce Corp., 340 B.R. 111, 124 (Bankr. M.D. Fla. 2006); South Motor Company of Dade County v. Accountable Construction Co., 707 So. 2d 909, 912 (Fla. 3d Dist. Ct. App. 1998).

The regular practice of billing in the regular course of dealing may establish an account stated if no objection to the amount of the bill is made within a reasonable time. Id. (citing First Union Disc. Brokerage Servs. v. Milos, 997 F.2d 835, 841 (11th Cir. 1993).

During the trial, Wallace introduced evidence that in September 2004, Mr. Magruda met with Mr. Boncosky several times to review Magruda's open account statement and the attendant invoices. As a result of these meetings, Wallace agreed to grant over $14,000.00 in credits and concessions to Magruda and in exchange Magruda acknowledged a revised open account debt in the amount of $20,563.28. Mr. Magruda was provided with a copy of the new balance of $20,563.28 for his open account. Based on the above, Wallace has demonstrated by a preponderance of the evidence that there was an agreement between Wallace and Magruda regarding the amount due on the open account and that in accordance with that agreement, Magruda agreed to pay Wallace $20,563.28.

Thus, Wallace has introduced competent evidence demonstrating by a preponderance of the evidence that the amount owed by Magruda to Wallace on the account stated is $20,563.28 together with interest computed at 1.5% per annum.

Accordingly, the Court finds for Wallace. It is hereby **ORDERED** and **ADJUDGED** that judgment will be entered in favor of Wallace as to each and every claim presented. The Clerk of the Court is hereby **DIRECTED** to enter judgment in favor of Wallace and against Magruda and to award Wallace the following for each count listed below:

Count I: $60,000.00 for Conversion of the Model 7600 and punitive damages in the amount of $120,000.00.

Count II: $13,000.00 for Breach of Contract on the Model 7600.

Count IV: $29,875.00 for Fraudulent Misrepresentation on the Ford and punitive damages in the amount of $59,750.00.

Count V: $0 for Breach of Contract on the Ford.

Count VII: $7,500.00 for Breach of Contract on the Trailer.

Count VIII: $0 for the Open Account.

Count IX: $20,563.28 for the Account Stated.

In total, Wallace is awarded $130,938.28 in compensatory damages and $179,750.00 in punitive damages and all appropriate interest. As noted above, Count I of Magruda's Amended Counterclaim is **DENIED**.

**DONE and ORDERED** in Chambers at Jacksonville, Florida this 19th day of March 2007.

John H. Moore II

JOHN H. MOORE II
United States District Judge

Copies to: Counsel of Record